SUMMONS ISSUED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK
2012 JUN 11 PM 12:18
U.S. DISTRICT COURT
EASTERN DISTRICT OF NY

Andrew A. Abrahams

        Plaintiff,

-against-

The City of New York; Joseph Imperatrice, in his individual capacity; and John Does 1 through 5, in their individual capacities,

        Defendants.

ECF CASE

CV 12 2911

COMPLAINT AND DEMAND FOR JURY TRIAL

ROSS, J.

POHORELSKY, M.J.

## PRELIMINARY STATEMENT

1. This is an action for money damages brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. §1983 for the Defendants' commissions of acts under color of law in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States and the laws of the State of New York.

## JURISDICTION

2. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

3. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a).

## VENUE

4. Venue is proper pursuant to 28 U.S.C. § 1391 (b) in that, *inter alia*, the events giving rise to the claim occurred in the Eastern District of New York.

## JURY DEMAND

5. The Plaintiff demands a trial by jury on each and every one of his claims as pled herein.

## PARTIES

6. Plaintiff ANDREW A. ABRAHAMS is a citizen of the United States and a resident of Connecticut. He has a degree from the Borough of Manhattan Community College and currently works as a dietician's assistant at New York Presbyterian Hospital.

7. Defendant THE CITY OF NEW YORK (the "City") is a municipal corporation within the State of New York.

8. The New York City Police Department (the "NYPD") is the department of the City responsible for, among other functions, arresting persons for offenses and maintaining custody over such persons prior to their initial appearance in court. At all times relevant hereto, the NYPD, together with the City, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the NYPD, together with the City, was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obeyed the Constitutions and laws of the United States and of the State of New York.

9. At all relevant times herein, defendants JOSEPH IMPERATRICE, and JOHN DOES 1 THROUGH 5 (collectively, the "Individual Defendants") were police officers employed by the NYPD and each was acting in the capacity of agent, servant, and employee of the City.

10. Plaintiff is unable to determine the actual names of John Does 1 through 5 at this time and thus sues them under fictitious names.

11. At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the City and otherwise performed and engaged in conduct incidental to the performance

of their lawful functions in the course of their duties. The Individual Defendants were acting for and on behalf of the City of New York at all times relevant herein with the power and authority vested in them as officers, agents and employee of the City of New York and incidental to the lawful pursuit of their duties as officers, employees and agents of the City of New York.

12. The Individual Defendants are sued in their individual capacities.

## STATEMENT OF FACTS

13. On July 7, 2011, at approximately 11:15 AM, Mr. Abrahams stopped his car near a friend's apartment on the corner of East 21st Street and Regent Place in Brooklyn, New York.

14. Mr. Abrahams had a brief conversation with his friend and handed him $30, which his friend had asked to borrow via text message earlier that morning.

15. Mr. Abrahams then began to drive northbound on East 21st Street and took a right onto Albemarle Road. As he proceeded east on Albermarle Road, he noticed a marked police vehicle behind him.

16. Mr. Abrahams had just made a right turn onto Flatbush Avenue when he heard sirens behind him. He promptly pulled his car to the side of the road and put it in park.

17. Three uniformed police officers exited their vehicle and approached Mr. Abrahams.

18. One of the officers asked Mr. Abrahams for his license and registration. Mr. Abrahams handed the documents to the officer, which the officer briefly inspected.

19. The officer then asked Mr. Abrahams if he had any illegal weapons or drugs in the car, to which Mr. Abrahams responded that he did not.

20. The officer directed Mr. Abrahams to get out of his car and sit on the bumper. Mr. Abrahams did as he was instructed.

21. The officers again began questioning Mr. Abrahams on what he was doing in the neighborhood and asked whether he had anything illegal in his vehicle. Mr. Abrahams explained that he was there to see a friend and even offered to show the police officers text messages from that morning and just prior to the police encounter to corroborate his account.

22. The officer then patted down Mr. Abrahams.

23. One of the officers then offered to make a deal with Mr. Abrahams and let him go in exchange for information on drug activity in the area. Mr. Abrahams explained that he did not have any such information.

24. The officer then began asking detailed questions about the friend Mr. Abrahams had just visited.

25. After answering all the officers' questions, and without explanation, the officer who initially approached Mr. Abrahams told him to turn around and handcuffed him.

26. The officer searched Mr. Abrahams again, more thoroughly, including inspecting the inside of his mouth.

27. After another series of questions from the officer about why Mr. Abrahams was in the area, the officer asked to see the text messages corroborating Mr. Abrahams explanation. After reading the text messages, the officer stated that they did not prove anything.

28. As the officer was questioning Mr. Abrahams, the other two officers began to thoroughly search Mr. Abrahams's car. They threatened Mr. Abrahams repeatedly that if they found anything, he would be facing "a lot of time." Mr. Abrahams repeatedly affirmed that he had nothing illegal in his vehicle or on his person.

29. At no point did the police have either reasonable grounds for believing that Mr.

Abrahams posed a danger to any of them, or probable cause to believe that he had committed a crime.

30. Two additional police officers, who identified themselves as "narcotics police officers," approached.

31. As a crowd of curious passers-by gathered, Mr. Abrahams began to cry, both out of embarrassment and pain from the tight handcuffs.

32. The two narcotics police officers took Mr. Abrahams by the arms and put him into their van. Through the window, Mr. Abrahams could see one of the other police officers driving his car away from the scene.

33. The narcotics officers drove the van up Beverly Road, turned onto Ocean Avenue and pulled over.

34. The officer in the passenger seat got out and instructed Mr. Abrahams to exit the van.

35. Once outside the van, the officer began to empty Mr. Abrahams pockets. The officer also took Mr. Abrahams's shoes off, removing the insoles.

36. Then, without explanation, the officer pulled down Mr. Abrahams's pants and boxers so that Mr. Abrahams was fully exposed from the waist down.

37. Without gloves on, the officer proceeded to lift Mr. Abrahams's testicles and look under them. The officer also used his hands to spread Mr. Abrahams's buttocks and look inside.

38. This was done in broad daylight, on a public street where pedestrians were walking by, cars were driving past, and many high-rise apartment buildings stood above them, where anyone could have looked out and seen Mr. Abrahams exposed.

39. After the officer completed the public strip search of Mr. Abrahams, he placed him

back into the van, and began to ask him questions, such as what he did for a living, why he is in New York City, and how can he afford his car.

40. Mr. Abrahams then heard a transmission over the radio that "the car was clean," at which point one of the officers in the van responded, "clean on this end as well."

41. The officers then told Mr. Abrahams that they were going to bring him to the 70th Precinct where he would be cleared and released.

42. Still in handcuffs, Mr. Abrahams was taken into the 70th Precinct and placed into a holding cell.

43. Mr. Abrahams was finally released around 1:15 PM.

44. At the precinct, he was issued two tickets for window tints, for which he was found guilty on May 23, 2012.

45. The NYPD has a formal policy, contained in its Patrol Guide, by which it authorizes strip searches only in situations where "the arresting officer reasonably suspects that weapons, contraband, or evidence may be concealed upon the person or in the clothing in such a manner that they may not be discovered by the previous search methods. Other factors that should be considered in determining the necessity for a strip search include, the nature of the crime (serious violent felony), arrest circumstances, subject's reputation (extremely violent person), act of violence, and discoveries from previous searches." Additionally, an NYPD directive, limiting and clarifying the strip search policy, was issued on May 13, 2004.

46. This notwithstanding, on information and belief, the NYPD has, and had at the time of the incident giving rise to this Compliant, a *de facto* policy and practice of strip-searching persons for reasons other than those specified in the Patrol Guide or NYPD directives.

## NOTICE OF CLAIM

47. On September 29, 2011, within 90 days from the dates the claims alleged in this Complaint arose, a Notice of Claim was served on the City.

48. At least 30 days have elapsed since the service of that Notice of Claim and adjustment or payment thereof has been neglected or refused.

49. The instant lawsuit is instituted within one year and 90 days after the dates the claims alleged in this Complaint arose.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Against the Individual Defendants

50. All other paragraphs herein are incorporated by reference as though fully set forth.

51. By initially searching the Plaintiff and his vehicle, then strip searching the Plaintiff on a public street in broad daylight, the Individual Defendants engaged under color of law in the violation of his right to privacy and his rights to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

### SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 Against the City of New York

52. All other paragraphs herein are incorporated by reference as though fully set forth.

53. Municipal liability for the violations of the Plaintiff's Fourth and Fourteenth Amendment rights rests upon the grounds set forth below.

54. At all times material to this Complaint, the defendant City, acting through the NYPD and the Individual Defendants, had *de facto* policies, practices, customs and usages which were a

direct and proximate cause of the unconstitutional conduct alleged herein.

55. At all times material to this Complaint, the defendant City, acting through the NYPD and the Individual Defendants, had *de facto* policies, practices, customs and usages of failing to properly train, screen, supervise or discipline employees and police officers, and of failing to inform the Individual Defendants' supervisors of their need to train, screen, supervise or discipline said defendants. The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

### THIRD CAUSE OF ACTION
### Pendant State Law Claim
### Battery

56. All other paragraphs herein are incorporated by reference as though fully set forth.

57. The Individual Defendants jointly and severally violated the Plaintiff's rights under New York law to be free from battery when they strip searched the Plaintiff in full view of the public and touched his genitals and buttocks without his permission.

58. As a result of the Individual Defendants' conduct, the Plaintiff suffered shock, fright, embarrassment and humiliation.

59. The Individual Defendants made this offsenive contact with the Plaintiff without privilege or consent.

60. Municipal liability for these torts rest upon principles of *respondeat superior*.

### FOURTH CAUSE OF ACTION
### Pendant State Law Claim
### New York State Constitution

61. All other paragraphs herein are incorporated by reference as though fully set forth.

62. By initially searching the Plaintiff and his vehicle, then strip searching the Plaintiff

-8-

on a public street in broad daylight, the Individual Defendants engaged under color of law in the violation of his right to privacy and his rights to be free from unreasonable searches and seizures under the New York State Constitution, Article I, Section 12.

63. Municipal liability for these torts rest upon principles of *respondeat superior*.

WHEREFORE, the Plaintiff requests that this Court:

1. Assume jurisdiction over this matter;

2. Award compensatory and punitive damages to the Plaintiff against the defendants, jointly and severally;

3. Award the Plaintiff reasonable costs, disbursements and attorney's fees; and

4. Grant any other relief the court deems appropriate.

Dated: New York, New York
June 8, 2012

          Respectfully submitted,
          Darius Wadia, L.L.C.

          By: Darius Wadia (Bar number DW8679)
          Attorney for Plaintiff
          233 Broadway, Suite 2208
          New York, New York 10279
          dwadia@wadialaw.com